UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BEVERLY K. COPELAND, MICHAEL C. )
HOUCHIN, MARC ANCELET, TIM )
SIMPSON, RON TURK, and BRUCE )
WILHELM, )
       Plaintiffs, )
        )
vs. )       1:09-cv-1287-RLY-DML
        )
PENSKE LOGISTICS LLC, PENSKE )
LOGISTICS, INC., and CHAUFFEURS )
TEAMSTERS, WAREHOUSEMEN, AND )
HELPERS LOCAL UNION NUMBER 135, )
       Defendants. )

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, former employees of Penske Logistics LLC and Penske Logistics, Inc. ("Penske"), and former members of the Chauffeurs, Teamsters, Warehousemen and Helpers Local Union Number 135 ("Local 135" or "Union"), bring a hybrid Section 301 claim against Penske and Local 135 under the Labor Management Relations Act ("LMRA"), and a third party beneficiary breach of contract claim against Penske. Penske and Local Union 135 now move for summary judgment. For the reasons set forth below, both motions are **GRANTED**.

**I.    Background**

Beginning in 1999, Penske contracted with Indianapolis Newspapers (the "Star")

1

to provide integrated logistics services that consisted of transporting newspapers from the Star's facility to various locations in central Indiana. (Affidavit of Steven Lozon ("Lozon Aff.") ¶ 4). The last contract for these services between Penske and the Star commenced on May 19, 2006, and expired on May 19, 2009 (the "Logistics Agreement"). (*Id.* ¶ 5, Ex. 1). At all times during Penske's operations in Indianapolis, the Star was its sole customer. (*Id.* ¶ 6).

Pursuant to its contract with the Star, Penske maintained a facility on North Georgetown Road in Indianapolis. (*Id.* ¶ 7). Penske employed all employees at the Indianapolis location, including Plaintiffs, to provide services under the Logistics Agreement. (Amended Complaint ¶ 29). At all times Penske provided services to the Star, Local 135 was the collective bargaining representative of the unit consisting of drivers and warehousemen employed at the Indianapolis location (the "Unit"), which included the Plaintiffs. (*Id.* ¶ 8). The last collective bargaining agreement between Penske and Local 135 covering the Unit was effective from May 21, 2006, through May 21, 2009 (the "Labor Contract").

In January 2009, the Star put its contract with Penske up for bid. (Lozon Aff. ¶ 10). Ultimately, the Star awarded the contract to another company. (*Id.* ¶ 11). Because the Star was Penske's only customer in Indianapolis, Penske decided to cease operations at the Indianapolis location effective May 21, 2009, when both the Logistics Agreement and the Labor Contract expired. (*Id.* ¶ 12).

In March 2009, Penske notified Local 135 that it had lost its contract with the Star

and would be shutting down its operations in Indianapolis effective May 21, 2009. (*Id*. ¶ 13). Local 135 requested to bargain with Penske regarding the effects on Unit employees of Penske losing its contract with the Star and shutting down its Indianapolis facility. (*Id*. ¶ 14).

Accordingly, on March 19, 2009, Local 135 and Penske engaged in effects bargaining. (*Id*.). Penske began the discussion by reiterating that it had lost the Logistics Contract, and because that contract expired on May 21, 2009, May 17, 2009 would be its last day of business at the Indianapolis location. (*Id*. ¶ 18). Penske offered to give Unit members preferential treatment as to positions at other Penske locations. (*Id*. ¶ 19). In response, Local 135 proposed that Penske give Unit members a number of additional benefits, including, *inter alia*: (a) allowing them to receive vacation pay while still working; (b) paying them for accrued and unused vacation time, (c) paying them for unused floating holidays, (d) extending their health, welfare, and pension benefits beyond the end of May 2009, (e) paying them severance in the amount of one week's pay for each year of service, and (f) extending their recall rights in the event Penske reacquired the Star's business. (*Id*. ¶ 20). While Penske agreed to Local 135's proposal to extend Unit members' recall rights in the event Penske reacquired the Star's business, it rejected the balance of Local 135's demands. (*Id*. ¶ 21).

Following this bargaining session, Plaintiff Michael Houchin ("Houchin") gave Mike Gillespie ("Gillespie"), the business representative of Local 135, a copy of Penske's contract with the Star (the "Logistics Agreement"). (Affidavit of Mike Gillespie

("Gillespie Aff.") ¶ 20). Before this time, Local 135 did not have knowledge of its provisions. (*Id.* ¶ 21). After reviewing the document, Gillespie contacted Steve Lozon ("Lozon"), Penske's Vice President of Labor Relations, and pointed out to him Section 12.2, (*id.* ¶ 22), which states, in relevant part:

> [I]f, as a result of any termination or expiration of this Agreement, Penske shuts down its operation and negotiates the effects of that shutdown (including without limitation severance pay, temporary continuation of health, welfare and pension benefits and worker retraining) ("Severance Benefits") with Local 135, or any successor collective bargaining representative, the [Star] will, immediately upon Penske's demand, reimburse Penske for the costs associated with the Severance Benefits upon which Penske and the bargaining representative agree in writing.

(Defendants' Ex. B at Ex. 2, Logistics Agreement, Section 12.2). Gillespie proposed that Penske give Local 135 members the benefits noted above and seek reimbursement from the Star. (Gillespie Aff. ¶ 23). Penske rejected this proposal, largely because Penske believed that seeking such reimbursement would jeopardize Penske's ability to acquire future work from the Star. (Lozon Aff. ¶ 25). At that point, Local 135 believed it had little or no economic leverage because Penske would be closing the Indianapolis facility irrespective of its offers or demands during effects bargaining. (Gillespie Aff. ¶ 25).

Ultimately, in June 2009, Penske and Local 135 entered into a Closure Agreement, which provided certain benefits to Penske's employees. (Lozon Aff. ¶ 27; *see also id.*, Ex. 2). The Closure Agreement provided individuals in Local 135 with certain benefits to which they were not entitled under the parties' collective bargaining agreement (the "Labor Contract") or otherwise. (*Id.* ¶ 28). Under the Closure Agreement, individuals in

4

the Unit, including Plaintiffs, received benefits that included payment for earned, but unused, vacation and holiday time, payment for one week of vacation time, and assistance in securing resumes and recommendation letters for their use in connection with their efforts to obtain subsequent employment. (*Id*. ¶ 29, Ex. 2).

Prior to Penske's closing, Houchin filed three grievances with Local 135: Grievance No. 158251, dated March 19, 2009; Grievance No. 158252, dated on March 27, 2009; and Grievance No. 158255, dated on April 6, 2009. (Defendants' Ex. J, Exs. 17, 22, 29). Plaintiff Beverly Copeland ("Copeland") filed Grievance No. 136839, dated May 19, 2009. (Gillespie Aff. ¶ 33, Ex. 3). These grievances challenged Penske's "job bid" procedure, Houchin's claim that the Star – not Penske – violated the Logistics Agreement, the loss of hours for the Unit, and Penske's alleged failure to honor a seniority list. (Lozon Aff. ¶¶ 31-32; Defendants' Ex. J, Exs. 17, 22, 29; Gillespie Aff. Ex. 3). The Union determined that Houchin's and Copeland's grievances had "insufficient merit" to proceed to the next step of the grievance procedure, arbitration. (Defendants' Ex. J, Ex. 34; Gillespie Aff. ¶ 34, Ex. 4).

Neither Houchin nor Copeland ever submitted a grievance in which they complained of the effects bargaining between Penske and Local 135 following Penske's loss of the Logistics Agreement. (Lozon Aff. ¶ 31; Gillespie Aff. ¶ 35). Likewise, Plaintiffs Marc Ancelet ("Ancelet"), Tim Simpson ("Simpson"), Ron Turk ("Turk"), and Bruce Wilhelm ("Wilhelm") never filed any grievances concerning the effects bargaining between Penske and Local 135. (Lozon Aff. ¶ 32; Gillespie Aff. ¶ 36). None of the

5

Plaintiffs filed any unfair labor practice charge with the National Labor Relations Board in which they alleged that Penske violated the National Labor Relations Act by failing to bargain in good faith during effects bargaining. (Lozon Aff. ¶ 33).

## II. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

## III. Discussion

Plaintiffs allege that the Union breached its duty of fair representation and that Penske breached the Labor Contract with the Union. These claims arise out of the fact

that the Plaintiffs did not receive "severance pay, temporary continuation of health, welfare, and pension benefits, and worker retraining." (*See* Amended Complaint ¶¶ 40-43). These interdependent claims are commonly referred to as a hybrid claim under Section 301 of the LMRA. *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164-65 (1983). In order for Plaintiffs to prevail in such an action, they "must have a meritorious claim against both the union and the employer; the claims are interlocking in the sense that neither is viable if the other fails." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003); *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)). Thus, to prevail against the Union, Plaintiffs must prove two elements: (1) that the Union breached its duty of fair representation, and (2) that Penske violated the terms of its collective bargaining agreement (the Labor Contract) with the Union. *DelCostello*, 462 U.S. at 165. Before reaching the merits, the court will first address the threshold issue of whether the Plaintiffs exhausted their administrative remedies prior to filing suit.

### 1. Failure to Exhaust Administrative Remedies

A plaintiff asserting a hybrid Section 301 claim is "required to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement" before filing the claim in federal court. *Id*. at 163; *see also Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 804 (7th Cir. 2008) ("Generally speaking, a member will not be heard to complain in court that his union breached its duty of fair representation unless he has first presented his grievance to the union . . . ."). If a plaintiff does not exhaust his remedies

7

under the agreement, he can avoid the exhaustion requirement by showing that: (1) the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks; (2) union officials are so hostile to the employee that he could not hope to obtain a full hearing; or (3) the internal appeals procedure will result in unreasonable delay. *Clayton v. Automobile Workers*, 451 U.S. 679, 689 (1980).

As previously stated, Plaintiffs' Complaint alleges that Penske violated several Labor Contract provisions because it did not give Plaintiffs "severance pay, temporary continuation of health, welfare, and pension benefits and worker retraining" and did not seek reimbursement for such benefits from the Star pursuant to Section 12.2 of the Logistics Agreement. (Amended Complaint ¶¶ 34, 40, 42). To the extent Plaintiffs' allegations implicate the Labor Contract at all, Plaintiffs failed to exhaust their administrative remedies under the Labor Contract because none of the Plaintiffs filed a grievance containing the allegations in their Amended Complaint. (Lozon Aff. ¶¶ 31-32; Gillespie Aff. ¶¶ 35-36). Indeed, the undisputed evidence shows that none of the Plaintiffs filed any grievance or unfair labor practice charge regarding (a) the manner in which Penske bargained over the effects of its contract loss and resulting shutdown or (b) the benefits Penske agreed to provide following the shutdown. (*Id.*). Moreover, because the Plaintiffs' complaints were never presented in a grievance to the Union, the *Clayton* factors are not applicable to excuse the Plaintiffs' failure to exhaust.

Plaintiffs' Amended Complaint alleges Labor Contract violations that they did not

address via the grievance and arbitration procedure. Therefore, Plaintiffs have not exhausted all available remedies with respect to the claims asserted in their Amended Complaint. The court may grant Penske's and Local 135's motions for summary judgment on Plaintiffs' hybrid Section 301 claim on this ground alone.

### 2. The Union's Duty of Fair Representation

Assuming *arguendo* that the Plaintiffs' claims are not barred because they failed to exhaust their administrative remedies, Plaintiffs' hybrid Section 301 claim still fails on the merits because they cannot establish that the Union breached its duty of fair representation to them.

To state such a claim, a plaintiff must show that the union's action was arbitrary, discriminatory or taken in bad faith. *See McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997); *Filippo v. N. Ind. Pub. Serv. Corp., Inc*., 141 F.3d 744, 748 (7th Cir. 1998). Whether a union's conduct is discriminatory or in bad faith "calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. Whether a union's actions are arbitrary requires an objective analysis of the adequacy of the union's conduct. *Crider*, 130 F.3d at 1243. A court will only deem a union's actions to be arbitrary if, in light of the factual or legal landscape at the time of the union's actions, the union's behavior is "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Assn. v. O'Neill*, 499 U.S. 65, 67 (1991) (internal quotation marks and citation omitted). Each of these possibilities are separate parts of the fair representation test, and each must be analyzed individually.

*Neal*, 349 F.3d at 369; *Crider*, 130 F.3d at 1243.

Plaintiffs contend that the Union violated its duty of fair representation to them by refusing to arbitrate Houchin's grievances because there was "so much at stake in the shut down for so many employees" and the employees "had nothing to lose and everything to gain by pursuing the grievance." (Plaintiffs' Response at 12). As noted above, however, Houchin's grievances are not the subject of the Plaintiffs' Amended Complaint and thus, they may not form the basis of a fair representation claim. But even if Houchin's grievance were the subject of Plaintiffs' Amended Complaint, Plaintiffs have submitted no evidence to support their claim. Indeed, their argument as to the Union's motives amounts to little more than speculation and opinion. *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) (finding that "conclusory statements, indications of opinion or speculation . . . do not produce a genuine issue for trial under Rule 56(c)).").

Plaintiffs also complain that the Union "fail[ed] to do more than make a telephone call about Penske's interest in bargaining about severance pay and benefits. . . ." and "Penske's stated, self-interested reluctance – it might harm future business dealings with the Star – is not a sound reason for not taking advantage of the claim in effects bargaining." (Plaintiffs' Response at 12). Again, assuming that Houchin's grievances were properly the subject of the Amended Complaint, Plaintiffs present no evidence to show that the Union's decision not to pursue reimbursement from the Star for purposes of the Plaintiffs' severance benefits was "so far outside the wide range of reasonableness as to be irrational." *Air Line Pilots Assn.*, 499 U.S. at 67 (internal quotation marks and

citation omitted). Penske made a calculated business decision not to request reimbursement for severance benefits for the Plaintiffs/employees, and it is not the province of the court to second-guess that decision. *See Ooley v. Schwitzer Div., Household Mfg., Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992) (applying an "extremely deferential standard" that precludes courts from "substitut[ing] their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call."). For these reasons, Plaintiffs' claim that Local 135 breached its duty of fair representation by not obtaining severance benefits during effects bargaining cannot survive summary judgment.

### 3. Breach of Contract

Plaintiffs contend that Penske breached the Labor Contract "by negotiating as if the Logistics Agreement did not exist" and "[r]efusing to implicate the Star to bargain the extension of temporary benefits, including severance pay over latent contract issues. . . ." (Plaintiffs' Response at 10). The Labor Contract, however, makes no mention of the Logistics Agreement, and imposes no obligation on Penske to take any action related to the Logistics Agreement or to provide the benefits Plaintiffs claim Penske failed to provide. (*See* Defendant's Ex. B at Ex. 1, Labor Contract).

Moreover, Section 12.2 of the Logistics Agreement does not require Penske to provide Plaintiffs with any severance benefits. Nor does Section 12.2 require the Star to reimburse Penske for any benefits it negotiated with the Union. Instead, it states that "*if*, as a result of any termination or the expiration of this Agreement, Penske shuts down its

11

operation and negotiates the effects of that shutdown . . . with Local 135," the Star "will, immediately *upon Penske's demand*, reimburse Penske for the costs associated with the Severance Benefits . . . ." (Defendants' Ex. B at Ex. 2, Logistics Agreement, Section 12.2) (emphasis added)). The language in the Logistics Agreement did not compel Penske to involve the Star in its effects bargaining process. Rather, the Logistics Agreement's permissive language left to Penske the business decision of whether to implicate the Star. Therefore, Penske did not violate the Labor Contract or the Logistics Agreement by not agreeing to provide severance and other benefits to Plaintiffs.

Plaintiffs have failed to present evidence sufficient to withstand Penske's and Local 135's motions for summary judgment on Plaintiffs' hybrid Section 301 claim. Accordingly, Penske's and Local 135's motions are **GRANTED**.

### B. Third Party Beneficiary

Plaintiffs allege that, as third party beneficiaries of the Logistics Agreement, they are entitled to enforce its terms. Plaintiffs must do more than show that performance of the contract would benefit them. *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996) (quoting *Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990)). To state a claim, Plaintiffs must show: (1) a clear intent by the actual parties to the Logistics Agreement to benefit Plaintiffs; (2) a duty imposed on one of the contracting parties in favor of the Plaintiffs; and (3) performance of the Logistics Agreement's terms is necessary to render Plaintiffs a direct benefit intended by the parties to the Logistics Agreement. *Id*.

12

Here, rather than address the essential elements listed above, Plaintiffs argue that "a reasonable juror could infer that the Plaintiffs were the unnamed beneficiaries of Section 12.2 of the Logistics Agreement" because "the Star and Penske entered into the Logistics Agreement in 2002 with the clear recognition that the workers would expect and need things like temporary health care, and severance pay, if there was a shut down." (Plaintiff's Response at 11). Plaintiffs' argument is insufficient to show third party beneficiary status because, at best, Plaintiffs' argument only establishes that performance of the Logistics Agreement would benefit them. Accordingly, Penske's motion for summary judgment on this claim is **GRANTED**.

**IV. Conclusion**

For the reasons set forth above, the court **GRANTS** Penske's Motion for Summary Judgment (Docket # 32) and the court **GRANTS** Local 135's Motion for Summary Judgment (Docket # 35).

**SO ORDERED** this 18th day of March 2011.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Brian R. Garrison
BAKER & DANIELS - Indianapolis
brian.garrison@bakerd.com

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

Michael C. Kendall
KENDALL LAW OFFICE
mckatlaw@aol.com

Cynthia K. Springer
BAKER & DANIELS
ckspring@bakerd.com